UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

MARIA STOCKING,

                                   22 CV 07347 (ER)

        Plaintiff,

-against-

NEWMARK KNIGHT FRANK

VALUATION & ADVISORY, LLC,

Defendants.

-------------------------------------------------------- X


## MOTION TO ASSIGN INDEPENDENT COUNSEL AND APPOINT A SPECIAL MASTER

Pursuant to Rule 60(b)(3), (5), and (6) of the Federal Rules of Civil Procedure, and the provisions under 28 U.S. Code Chapter 40, particularly sections 593 and 594, Plaintiff Maria Stocking respectfully moves this Court to assign independent counsel or appoint a Special Master for this case. Declaration of Maria Stocking (*See* Stocking Decl.) is submitted in support of Plaintiff's motion to appoint a Special Master and assign Independent Counsel.

Annexed as Exhibit 1 is an Evidentiary Sample of Spoliated Evidence.

## FACTUAL BACKGROUND

In November 2021, Plaintiff filed an employment discrimination complaint against Newmark in the Southern District of Florida, alleging discriminatory practices based on age, gender, and national origin. (Doc. 1) These claims showed substantial grounds for a significant verdict based on demonstrable and serious damages. (*See* Stocking Decl. pp.7-8)

During litigation, Plaintiff identified conflicts of interest, procedural defects, and inequitable misconduct that led to the case's dismissal and transfer to the Southern District of New York. At that time, Plaintiff lacked the legal expertise to seek relief from the courts.

When Plaintiff attempted to submit evidence of this misconduct to challenge a consequential summary judgement, Mr. Karlin, her New York counsel, instructed her to never raise the matter with him again.

Subsequently, Plaintiff conducted an independent inquiry with the assistance of impartial legal professionals.

This Declaration of Maria Stocking summarizes the findings and conclusions of the inquiry into the legal proceedings of four related discrimination complaints filed against Newmark in the Southern District of Florida.

Plaintiff has identified similar misconduct in the proceedings of the Southern District of New York and, accordingly, petitions the Court to assign independent counsel and appoint a Special Master to oversee the proceedings, ensuring compliance and impartiality.

Plaintiff references the Florida incidents of this case to illustrate how similar patterns of misconduct are replicating in the Southern District of New York, with the intent to conceal evidence, dismiss the claim and avoid substantial liability.

## FLORIDA MISCONDUCT IS REPLICATING IN THE NEW YORK PROCEEDINGS

Plaintiff's declaration reveals how Liberty Mutual and Newmark, leveraged their far-reaching power to sway Florida bench and bar members to illicitly manipulate legal proceedings to facilitate defense-favorable outcomes. This synchronized effort led to the setting of a new legal precedent enabling the quick, simultaneous dismissals of *Maria Stocking v. Newmark* and *Vivian Toro v Newmark,* in the Southern District of Florida. (Stocking Decl.pp 16-19)

Plaintiff has identified similar misconduct in the proceedings of the Southern District of New York:

***Plaintiff's Florida Attorney and New York Attorney Serve Critical Motions to Defunct Addresses to Secure Defense-Favorable Judgments in Two Related Newmark Claims***

This section illustrates how Plaintiff's Florida and New York counsel repeatedly served critical motions to defunct addresses, to conceal and prevent Plaintiff' from opposing crucial motions needed to secure defense-favorable outcomes for Newmark, insured by Liberty Mutual

Plaintiff shows how counsel Peter Hoogerwoerd deliberately served critical motions to a defunct address plaintiff vacated a decade earlier, despite having her current address. This tactic effectively concealed the filings and prevented the Plaintiff from opposing motions that were crucial in securing defense-favorable outcomes. (See Exhibit L to Stocking Decl., pp 14-15.)

Plaintiff's New York counsel, Stewart Karlin, filed *Vivian Toro v. Newmark* on January 2024 serving it to a defunct address vacated by Newmark eight years earlier, despite having Newmark's correct address from prior claims. - a serious error that justified dismissal of the claim.

By June 2024, six months later, Newmark had not responded to *Vivian Toro v. Newmark*, despite the 20-day response deadline. When questioned, Mr. Karlin claimed ignorance and made no effort to investigate. Suspicious, Plaintiff's discovered claim had been served to a defunct address, vacated by Newmark in 2015.

Worse, *Vivian Toro v. Newmark* was weeks from being nullified by the statute of limitations. Had Plaintiff not caught this error, the case would have been permanently dismissed—and would have been a significant victory for Newmark and Liberty Mutual.

This highlights a clear pattern of Plaintiff's attorneys aligning with Newmark's interests, bolstering the case for appointing a Special Master and independent counsel.

### *Under The Influence of Newmark and Cantor, Plaintiff's Florida and New York Counsel Adopt Defense-Favorable Strategies*

Plaintiff details how her Florida attorney's legal strategy dramatically shifted after uncovering the identity of Newmark's attorneys and the extensive reach of its parent company, Cantor Fitzgerald. (Stocking Decl., pp. 9-13)

Plaintiff's New York counsel, Mr. Karling, well-acquainted with Newmark and Cantor, initially showed strong enthusiasm for these claims, committed to our agreed-upon legal strategies, and was eager to take on the related case, *Vivian Toro v. Newmark.*

As in Florida, Mr. Karlin's initial motivated stance shifted, and his communication became abrupt and mostly non-existent. To prepare for discovery, Plaintiff provided him a list of witnesses and specific evidence to be compelled. Like Florida counsel, Mr. Karlin ignored Plaintiff's discovery inquiries for months, leaving her in legal limbo. Then, 20 days before the discovery deadline, he informed Plaintiff that Newmark had produced over 100,000 documents he had not reviewed and that he would only c*all three witness*es. He also failed to respond to requests for communications with the defense. He also failed to file a motion to seal the court records due to HIPPA confidentiality. He refused to call Plaintiff's former clients and colleagues as witnesses. He refused to amend the complaint to add John Busi, Newmark's President as defendant.

Now it is almost ten days until the discovery deadline and Plaintiff has not been deposed, has not been asked to submit evidence, and has been kept in the dark about her case.

So again, like in Florida, Plaintiff is oppressed by her own counsel who is in control of the legal proceedings that stop her from making a statement, that obstruct the submission of her evidence and prevent the examination of her witnesses.

The same scenario happened in Florida, but back then Plaintiff could not fathom that her own attorney was dominating her into legal submission for the benefit Newmark.

Today, Plaintiff observes that great measures are being taken in New York to prevent her submission of evidence.  It is clear the Plaintiff is being set up for her claim to be dismissed for lack of material fact. Annexed Exhibit 1 is a sample of the spoliated evidence Plaintiff is being prevented from submitting in anticipation of litigation.

This exposes a recurring inter-state pattern of obstructing the admission of evidence that substantiates the plaintiff's claims, supporting motion to appoint a Special Master and assign Independent Counsel.

*Spoliation Of Evidence in Florida*

The Florida complaint details how Newmark deceitfully seized Plaintiff's computer under the guise of urgent software updates. (*See* Doc 1, #.57) When Plaintiff requested its return, Newmark cited a policy that retains computers during medical leave. However, this policy did not apply to a similarly situated employee, Raymond Higgins, who was allowed to retain his computer while on an extended medical

leave. Newmark fabricated this policy specifically to target the Plaintiff, as her computer was never returned.

In retrospect, the confiscation of Plaintiff's computer coincided with Newmark's termination of Antonia Donoso, a longtime colleague of the Plaintiff at the Miami office. Ms. Donoso was terminated in a retaliatory manner after repeatedly voicing concerns about inequitable conduct.

Newmark was certain that Plaintiff's computer, holding decades of confidential emails and proprietary documents, held implicating content.

Anticipating that Ms. Donoso would seek Plaintiff's assistance in obtaining this evidence, Newmark acted swiftly, seizing the computer before Plaintiff could back up her files. This demonstrates Newmark's intent of concealing evidence in anticipation of litigation.

In the Florida courts, Evidentiary Hearing was abruptly cancelled where Plaintiff was to submit evidence of Newmark's inequitable conduct in support of the invalidity of her expired 2013 employment grounds. (*See* Stocking Decl. P. 13)

*Spoliation of Evidence New York*

Newmark's concealing of evidence in anticipation of litigation escalates by the overwhelming of Plaintiff's attorney with over 100,000 non-classified documents for discovery within a compressed time frame. Mr. Karlin states that in similar employment claims, discovery typically involves no more than

5,000 documents. Newmark is deliberately hijacking the discovery process by exhausting counsel with over 100,000 documents, making it difficult to locate critical evidence relevant to these legal proceedings. Newmark's actions, driven by apparent culpability, reflect their urgent attempt to conceal evidence and flagrantly violate the Plaintiff's right to due process, while making a debauched mockery of our judicial system.

***Extensive Measures By Liberty Mutual And Newmark To Enable Misconduct And Undermine Fair Proceedings***

This following timeline underscores the motion for a Special Master, emphasizing the extreme legal risks Newmark has been willing to take to eliminate these substantial claims.

On August 19, 2022, Plaintiff reported to Ms. Springer her suspicion of an undisclosed conflict of interest between Newmark's counsel, CSK, and Plaintiff's counsel, Mr.Hoogerwoerd, catalyzing the biased dismissal and transfer of her claim. (*See* Stocking Decl. p.19)

Ms. Springer dismissed Plaintiff's concerns as mere frustration over not securing a large settlement. (*See* Stocking Decl. Exhibit S)

This response alarmed Plaintiff, as Mr. Hoogerwoerd and CSK continued representing opposing sides in the related Newmark cases: *Donoso v. Newmark, Toro v. Newmark, and Toro v. Newmark/Bowery*.

On September 6, 2022, Plaintiff filed a formal statement regarding the legal misconduct observed during the Florida litigation. (Doc #35, pp. 2-7)

In June 2023, in *Vivian Toro v. Newmark/Bowery*, Ms. Toro filed a motion documenting Mr. Hoogerwoerd's undermining and misrepresentation of her claim in favor of Newmark/Bowery. (*See* Stocking Decl.pp.20-21)

Later, Plaintiff discovered the full extent of the conflict of interest and misconduct.

Plaintiff's counsel, Peter Hoogerwoerd, had a 20-year personal and professional relationship with Newmark's attorneys, Cole, Scott & Kissane (CSK), his former employer.

- CSK acts as agents for Liberty Mutual, Newmark's insurer.

- Newmark executives, John Bourbeau and Patrick Duffy, used insider knowledge from CCRE to help CSK secure favorable lease terms for their Miami office.

- These financial ties suggest CSK was driven to secure outcomes favoring Newmark, insured by Liberty Mutual.

- CSK leveraged their close relationship with Plaintiff's counsel to covertly undermine Plaintiff's position while ostensibly representing her. (*See* Stocking Decl.pp. 11-12)

By reporting this conflict to in-house counsel Ms. Springer, Newmark knew of the deep conflicts between Liberty Mutual, Newmark executives, their counsel Cole, Scott & Kissane, and Plaintiff's counsel Peter Hoogerwoerd, Yet, Newmark ignored the conflict, permitting the proceedings to continue. The financially motivated ties between Newmark and CSK, reinforced by insider CCRE dealings, indicate a deliberate effort to manipulate litigation outcomes in Newmark's favor. As a publicly traded company, Newmark violated legal and ethical standards by allowing judicial misconduct and conflicts of interest to persist. This breach of fiduciary duty compromised the legal process, infringed on Plaintiff's Constitutional rights, and violated corporate governance and securities laws.

***Newmark and Liberty Mutual: Continued Bad Faith Involvement And Financial Motive In New York Proceedings***

It defies logic and is implausible that two independent and unrelate employment attorneys, from different states—New York and Florida—after thoroughly vetting Plaintiff's claims years apart, would commit to aggressively prosecuting multiple Newmark claims, only to suddenly shift to defense-favorable strategies that resulted in significant financial losses to their law firms. (*See* Decl. Pp. 21-22)

The only common thread between Plaintiff's Florida counsel, Peter Hoogerwoerd, and New York counsel, Stewart Karlin, is the bad faith and undue influence exerted by Newmark and its insurer, Liberty Mutual.

It would be naive to assume that, simply because the claims were transferred to the New York courts, Liberty Mutual would abandon their illicit tactics employed in Florida. Moreover, Liberty Mutual's agents at Cole, Scott, Kissane, P.A., Andrew Simon and John Cody German, still have a vested interest in the New York claims, despite no longer being counsel, as they continue to get notifications on all correspondence of the New York proceedings.

Therefore, the appointment of a Special Master is essential to prevent Liberty Mutual from exerting bad faith influence and tainting the New York proceedings, as they did in Florida.

### *Influence Of Cantor Fitzgerald*

Imperative to note is the abrupt shift in the enthusiasm and legal strategy of Plaintiff's counsel in both New York and Florida following the intervention of Newmark and its parent company, Cantor Fitzgerald, is deeply concerning. Cantor Fitzgerald, a global powerhouse, exerts significant influence across various sectors, including legal and business arenas. This influence has permeated the four Newmark-related claims, raising serious concerns about the ability to secure unbiased legal representation committed to pursuing this case to the fullest extent of the law. The expansive and covert power wielded by Cantor

Fitzgerald poses a grave threat to the fairness of these proceedings, highlighting the critical need for independent oversight to safeguard impartiality and justice.

### *Illogical Economic And Business Practices That Undermine Plaintiff's Case In Favor Of Defense*

It is economically irrational for counsel not to fully pursue cases with nuclear verdict potential. (*See* Stocking Decl.pp 21-22). The misconduct of Plaintiff's attorneys raises serious concerns of undisclosed incentives to mitigate the defendant's liability. Despite four years of heavy investment in four, strong Newmark claims, both attorneys suffered substantial losses—defying standard practices and suggesting external influence. These losses are not due to weak claims; both attorneys vetted the evidence and were initially extremely confident. However, once Newmark, Liberty Mutual and Cantor Fitzgerald's influence took hold, both counsels shifted to defense-favorable strategies, resulting in dismissals and significant losses to their firms.

Two days after a huge win for Newmark and significant losses to his law firm, Mr. Hoogerwoerd was promoted to partner and made a substantial luxury purchase flaunted on social media. (See Stocking Decl., p. 22). This promotion, following major firm losses, strongly suggests external influences on counsel's actions.

In the case of *Vivian Toro v. Bowery/Newmark,* after dismissing Mr. Hoogerwoerd for misconduct, Ms. Toro engaged Mr. Karlin to take over as counsel. Instead of negotiating a financial settlement, Mr. Karlin inexplicably requested the case be closed with no award—a decision that defies business logic. (See Exhibit of this Motion).

*In Vivian Toro v. Newmark*, Mr. Karlin's blatant disregard for Newmark's six-month failure to respond to a lawsuit he filed at a defunct address—within weeks of being dismissed due to the statute of limitations—

blatantly undermines his commitment to his client. This conduct defies business logic and adds to the disturbing pattern observed in these proceedings.

The irrational business practices of Plaintiff's counsel in New York and Florida, consistently favoring the defense, underscore the urgent need for independent oversight. This conduct raises serious concerns about the integrity of these proceedings. Plaintiff respectfully requests the appointment of a Special Master and Independent Counsel to ensure fairness and impartiality in this case.


## CASE LAW SUPPORT

The appointment of a Special Master and the assignment of independent counsel is absolutely necessary to ensure the fairness and integrity of these proceedings, given the documented misconduct and potential conflicts of interest. The following cases support such appointments:

1. *Morrison v. Olson,* 487 *U.S. 654 (1988)* - Upheld the constitutionality of appointing independent counsel to ensure impartiality in cases of potential conflicts of interest.

2. *United States v. Microsoft Corp*., *253 F.3d 34 (D.C. Cir. 2001)* - Demonstrated the court's willingness to appoint a Special Master to manage complex procedural aspects and ensure fair proceedings.

3. *In re Sealed Case, 838 F.2d 476 (D.C. Cir. 1988)* - Highlighted the importance of maintaining judicial neutrality and the need for independent oversight in cases involving potential conflicts of interest.

4. *Weinstein v. University of Connecticut, 753 F. Supp. 84 (D. Conn. 1990)* - Showed the role of a Special Master in ensuring fairness and efficiency in the judicial process.

## REQUEST FOR RELIEF

In light of these serious concerns, Plaintiff respectfully requests that the Court:

1. Assign Independent Counsel: To ensure fair representation and proper handling of the case, independent counsel should be assigned to replace Mr. Karlin.

2. Appoint a Special Master: Alternatively, or in addition, appoint a Special Master to oversee the case to guarantee the integrity of the proceedings and protect the Plaintiff's rights to a fair trial.

## **<u>CONCLUSION</u>**

Given the documented inaction, errors, misconduct and potential conflicts of interest strongly evident in this claim, coupled with the substantial interests and extensive influence of Liberty Mutual, Newmark, Cantor Fitzgerald and the economic illogic of current legal strategies, it is imperative to assign independent counsel and appoint a Special Master to oversee this case. Such measures are necessary to ensure compliance and fairness in all related legal proceedings and safeguard the Plaintiff's Constitutional right to due process and a fair and just adjudication of her claims.

Respectfully submitted,

Dated: August 15, 2024                    */s/Maria Stocking*

Miami, Florida                              Maria Stocking   *Plaintiff*

888 Biscayne Boulevard, 57th Floor

Miami, Florida 33132

786-857-3681

Mstocking747@outlook.com

<u>**EXHIBIT 1 – EVIDENTIARY SAMPLE OF SPOLIATED EVIDENCE**</u>

*Newmark's Role in Greg Becker's Ongoing Discriminatory and Harassing Treatment of Hispanic Women Over 50*

The Plaintiff's complaint outlines how Greg Becker imposed harsher standards on Maria Stocking and Antonia Donoso compared to younger, less experienced white men. Becker harassed Plaintiff by forcing repeated revisions of her appraisals under excessive scrutiny, while favoring younger, white men whose work faced minimal review despite their limited experience. Becker's relentless harassment harmed Plaintiff's health, depleting her remission and causing severe pain and strain. Eventually, Becker emailed he would no longer sign or assign her appraisals due to poor-quality work, yet he continued to do so for the younger, less experienced white men.

Antonia Donoso's statement, acknowledged by Ms. Goldsmith, reveals that Greg Becker used the same harassing tactics on Ms. Donoso, a Hispanic woman over 50 with an MBA, 20 years' experience, and a stellar employment record. Becker excessively scrutinized her work, forced repeated revisions, and reduced her workload, citing poor performance. Becker then sent Ms. Donoso the same email he sent to Plaintiff, stating he would no longer sign or assign her appraisals due to poor-quality work. After repeated complaints to Newmark about the ongoing discrimination, Ms. Donoso was ultimately terminated in a retaliatory manner.

Please refer to Addenda A, B and C

**Addenda A**

April 19, 2021: Antonia Donoso's statement to Shari Goldsmith: "There was gender discrimination against all females as the men received more work than the females."

Maria Stocking and Antonia Donoso were the only Hispanic female appraisers on staff.

Newmark has knowledge of discrimination.

Vice President, Assistant General Counsel
Cantor Fitzgerald / BGC Partners / Newmark
Office: (212) 610-2447
Mobile: (917) 549-9926
Shari.Goldsmith@cantor.com



---

**From:** Goldsmith, Shari <Shari.Goldsmith@cantor.com>
**Sent:** Thursday, August 26, 2021 4:10 PM
**To:** gregory.brown@hwhlaw.com; maria.stocking@live.com
**Cc:** Davis, Ikett <Ikett.Davis@nmrk.com>
**Subject:** FW: Maria Stocking/Newmark EEOC

Mr. Brown,
I understand you represent our employee Maria Stocking. Ms. Stocking's EEOC charge is the first time we are learning of her alleged harassment and discrimination.  We take complaints of the type raised in Ms. Stocking's charge very seriously.  We would like to schedule a meeting with Ms. Stocking, with you present, so that we can get further information to fully investigate her claims. To that end, please let me know when you and Ms. Stocking are available for such a meeting. In the meantime, please direct all future communications regarding this matter to my attention.
Thank you,

**Shari M. Goldsmith**
Vice President, Assistant General Counsel
Cantor Fitzgerald / BGC Partners / Newmark
Office: (212) 610-2447
Mobile: (917) 549-9926
Shari.Goldsmith@cantor.com



---

**From:** Maria Stocking <maria.stocking@live.com>
**Sent:** Monday, August 23, 2021 12:50 PM
**To:** PABLO ALFONSO <PABLO.ALFONSO@EEOC.GOV>; Davis, Ikett <Ikett.Davis@nmrk.com>
**Subject:** Maria Stocking/Newmark EEOC

Hi Pablo,

Thank you for all your help.

 The name of my attorney is Gregory P. Brown and his email is gregory.brown@hwhlaw.com.  The Newmark contact for HR is Ikett Davis and her email is idavis@ngkf.com.  Please copy Greg and I on all correspondence with Newmark.

I look forward to receiving the "right to sue" letter.

Thank you for all your help Pablo. I really appreciate it!

Kind regards,

**Addenda B**

April 22, 2021:  Shari Goldsmith's response: Ms. Donoso's supervisor, Greg Becker, did not feel comfortable assigning her additional work due to her poor-quality work product.

This demonstrates Newmark's knowledge of how Greg Becker employed the same discriminatory practices against both Ms. Stocking and Ms. Donoso, the only Hispanic female appraisers on his staff -

**From:** Goldsmith, Shari <Shari.Goldsmith@cantor.com>
**Sent:** Thursday, April 22, 2021 2:43 PM
**To:** randy@rafesq.com
**Subject:** RE: Antonia Donoso severance agreement

FRE 408, etc.

Randy,

As I mentioned when we spoke, the Company takes complaints of discrimination on the basis of gender or any other protected category very seriously; if your client has specific allegations of discrimination, please bring them to my attention immediately so that she can be interviewed and the claim can be properly investigated. Her (inaccurate) conjecture about the employment status of her female coworker and conclusory allegation that "men received more work" is not sufficient to form the basis of a meaningful investigation.  Notably, in her several conversations with HR, Ms. Donoso never mentioned that she believed she was discriminated against due to her gender.  This is buttressed by her departure email; while I understand the idea of a professional send-off, in my experience, individuals who believe they have been discriminated against do not send the type of effusive and complimentary thank you email your client sent.

Rather, I believe Ms. Donoso understood the situation to be as she discussed with HR and management prior to her separation, namely that Ms. Donoso's supervisors did not feel comfortable providing her additional assignments due to her work product and the fact that she was often inaccessible and not responsive during business hours. Management believes this is because, as she disclosed to both the office head and HR, she was driving for Lyft at the same time that she was working for Newmark, and therefore, was in violation of her contractual obligation to devote her business time and attention to the furtherance of the Company's business

For these reasons, the Company believes that it's severance offer is fair and appropriate. I am attaching a revised separation agreement that incorporates a non-disparagement obligation on behalf of the individuals identified below and eliminates any future cooperation obligation on Ms. Donoso's part. If your client would like to accept this offer, you can return a signed copy to me.

Thank you,

**Shari M. Goldsmith**

Vice President, Assistant General Counsel

Cantor Fitzgerald / BGC Partners / Newmark

Office: (212) 610-2447

Mobile: (917) 549-9926

Shari.Goldsmith@cantor.com

<image001.jpg>

<image002.jpg>

<image003.png>

**From:** randy@rafesq.com <randy@rafesq.com>
**Sent:** Monday, April 19, 2021 1:52 PM

## Addenda C

August 23, 2021: Shari Goldsmith's response to Maria Stocking's EEOC complaint: "Ms. Stocking's EEOC charge is the first time we are learning of her alleged harassment and discrimination."

Ms. Goldsmith's April 22, 2021 statement clearly shows Newmark's prior knowledge of the discrimination, which is contradicted by her denial in this August 23, 2021 statement.

Newmark denying knowledge of discrimination, when they clearly knew about it in a prior email

Vice President, Assistant General Counsel
Cantor Fitzgerald / BGC Partners / Newmark
Office: (212) 610-2447
Mobile: (917) 549-9926
Shari.Goldsmith@cantor.com



**From:** Goldsmith, Shari <Shari.Goldsmith@cantor.com>
**Sent:** Thursday, August 26, 2021 4:10 PM
**To:** gregory.brown@hwhlaw.com; maria.stocking@live.com
**Cc:** Davis, Ikett <Ikett.Davis@nmrk.com>
**Subject:** FW: Maria Stocking/Newmark EEOC

Mr. Brown,
I understand you represent our employee Maria Stocking. Ms. Stocking's EEOC charge is the first time we are learning of her alleged harassment and discrimination. We take complaints of the type raised in Ms. Stocking's charge very seriously. We would like to schedule a meeting with Ms. Stocking, with you present, so that we can get further information to fully investigate her claims. To that end, please let me know when you and Ms. Stocking are available for such a meeting. In the meantime, please direct all future communications regarding this matter to my attention.
Thank you,

**Shari M. Goldsmith**
Vice President, Assistant General Counsel
Cantor Fitzgerald / BGC Partners / Newmark
Office: (212) 610-2447
Mobile: (917) 549-9926
Shari.Goldsmith@cantor.com



**From:** Maria Stocking <maria.stocking@live.com>
**Sent:** Monday, August 23, 2021 12:50 PM
**To:** PABLO ALFONSO <PABLO.ALFONSO@EEOC.GOV>; Davis, Ikett <Ikett.Davis@nmrk.com>
**Subject:** Maria Stocking/Newmark EEOC

Hi Pablo,

Thank you for all your help.

The name of my attorney is Gregory P. Brown and his email is gregory.brown@hwhlaw.com. The Newmark contact for HR is Ikett Davis and her email is idavis@ngkf.com. Please copy Greg and I on all correspondence with Newmark.

I look forward to receiving the "right to sue" letter.

Thank you for all your help Pablo. I really appreciate it!

Kind regards,

### *Busi's Complicity in Enabling Greg Becker's Racially Hostile and Discriminatory Conduct*

Initial complaint tells how Plaintiff's supervisor, Greg Becker, used racial slurs while verbally and physically assaulting a Hispanic employee, Jose Ortiz. This racially charged incident took place at a work event in the presence of other employees. After filing the claim, Plaintiff learned that Mr. Busi ordered the downplaying of this racially charged incident, allowing Greg Becker to remain unsanctioned as a supervisor. With Busi's approval, Becker continued leading a team of mostly young white men and three older Hispanic women, including Plaintiff. Busi's decision to retain Becker as a supervisor over those he had shown racial hostility toward subjected Plaintiff, a Hispanic woman, to years of oppressive and discriminatory treatment, resulting in irreparable harm. By amending the complaint, Plaintiff seeks to hold John Busi accountable for enabling a prejudiced and aggressive supervisor to continue in his role, prioritizing his interests over the well-being of Plaintiff and other employees.

Newmark dismisses this racially charged altercation as a "kitchen sink" claim. However, Plaintiff has multiple witnesses, including Jose Ortiz, Greg Becker, and Antonia Donoso—the victim, perpetrator, and witness. Newmark continues to spoliate evidence by obstructing the examination of these key witnesses.

***Mr. Busi's Discriminatory Policy Exceptions and Reassignment of Plaintiff's Clients to Younger, White Men***

After filing her initial complaint, Plaintiff discovered that Mr. Busi had made exceptions to his strict no inter-state appraising policy for younger, white men. Before Mr. Busi became president, Plaintiff, as a Director, had the privilege of appraising properties nationally and held multiple inter-state licenses, offering clients a one-stop service for all national work. Upon becoming president, Mr. Busi rescinded the right to appraise nationally, restricting appraisers to their home state. Despite Plaintiff's requests to be exempt due to her substantial national workload, Mr. Busi consistently refused, resulting in the loss of national clients and business for Plaintiff. She later learned that Mr. Busi had allowed certain younger, white men to bypass this policy, granting them the privilege of appraising properties outside their home state.

Mr. Busi implemented policies that allowed younger, white men to take over Plaintiff's clients while maintaining "exclusive rights" to their own clients. For example, David Gray was handed Plaintiff's long-held Bank United account, which she had spent years securing and managing. Similarly, Greg Becker was given exclusive control over his Prologis account.